# 19-0197-cr(L), 19-0780-cr(CON)

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

LEONID MOMOTOK, ALEXANDER GARKUSHA,

*Defendants,*

VLADISLAV KHALUPSKY, VITALY KORCHEVSKY,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT VITALY KORCHEVSKY

RANDY SINGER
ROSALYN SINGER
KEVIN HOFFMAN
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, Virginia 23451
(757) 301-9995

STEVEN GARY BRILL
SULLIVAN & BRILL, LLP
115 Broadway, 17th Floor
New York, New York 10006
(212) 566-1000

*Attorneys for Defendant-Appellant Vitaly Korchevsky*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iv

JURISDICTION AND TIMELINESS ....................................................1

ISSUES PRESENTED...........................................................................1

STATEMENT OF THE CASE................................................................2

    I.    THE INSIDER TRADING SCHEME AS ALLEGED IN
        THE SUPERSEDING INDICTMENT. ................................3

    II.   "YOU DON'T CONVICT ON SMOKE"............................5

    III.  THE TRIAL AND SENTENCING ....................................9

STATEMENT OF FACTS ...................................................................10

    I.    TRADING BY MR. KORCHEVSKY PRIOR TO THE
        ALLEGED INSIDER TRADING SCHEME ....................10

    II.   THE TESTIMONY OF THE GOVERNMENT'S
        COOPERATING WITNESSES..........................................12

        A.    The time frame for the alleged conspiracy ...............14

        B.    The evidence of multiple conspiracies......................15

    III.  KORCHEVSKY'S TRADING FROM 2011–2015 ...........17

SUMMARY OF ARGUMENT .............................................................21

LAW AND ARGUMENT .....................................................................23

    I.    THE GOVERNMENT FAILED TO PROVE A SINGLE
        CONSPIRACY INVOLVING BOTH DEFENDANTS....................23

        A.    Legal standards ........................................................23

        B.    The government's primary witness claimed there were
               multiple conspiracies and the government introduced
               no evidence to dispute that testimony......................27

        C.    Being joined with Khalupsky at trial caused Mr.
               Korchevsky substantial spillover prejudice. .............28

i

II.     BETWEEN THE SUPERSEDING INDICTMENT AND THE PROOF AT TRIAL, THE GOVERNMENT SO DRAMATICALLY CHANGED THE TYPE, NUMBER, AND SCOPE OF THE ALLEGEDLY ILLEGAL TRADES THAT IT CONSTRUCTIVELY AMENDED THE SUPERSEDING INDICTMENT OR, AT THE LEAST, CREATED A PREJUDICIAL VARIANCE THAT REQUIRES A NEW TRIAL ............................................................. 33

     A.    Legal standards ....................................................... 33

     B.    The nature of the variance....................................... 35

     C.    The variance between the factual allegations in the Superseding Indictment and the evidence presented at trial substantially prejudiced Mr. Korchevsky......................... 36

          1.    The variance so broadened the Superseding Indictment that it constituted a constructive amendment..................................................... 36

          2.    Even if there was no constructive amendment, the variance prejudiced Mr. Korchevsky and therefore requires reversal ............................... 38

III.    THE GOVERNMENT FAILED TO PROVE THE ELEMENTS OF SECURITIES FRAUD........................................... 40

     A.    Legal standards ....................................................... 40

     B.    The victims identified in Counts Three and Four were not owed a duty by Mr. Korchevsky......................... 44

     C.    Computer hacking does not provide the requisite deception under Section 10(b), particularly with regard to Count Four ........................................................... 45

IV.    THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY THAT A DISPUTED EMAIL HAD BEEN SENT TO OR BY MR. KORCHEVSKY, THEREBY DECIDING A CRITICAL AND CONTESTED FACTUAL ISSUE THAT SHOULD HAVE BEEN LEFT TO THE JURY ................................ 47

     A.    Legal standards ....................................................... 47

B. The jury was presented with a fiercely disputed factual allegation as to whether Mr. Korchevsky ever accessed the stargate email account ........................................................... 48

C. The trial court improperly prejudiced the jury ......................... 51

V. THE GOVERNMENT DID NOT ESTABLISH VENUE FOR COUNTS THREE AND FOUR ................................................ 55

A. Legal standards .......................................................... 55

B. None of the acts allegedly constituting a violation of the securities fraud statutes occurred in the Eastern District of New York ................................................. 56

CONCLUSION ............................................................................ 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Burks v. United States*,
    437 U.S. 1 (1978) .......................................................................47

*Chiarella v. U.S.*,
    445 U.S. 222 (1980) ...................................................... 22, 43, 44

*Jackson v. Virginia*,
    443 U.S. 307 (1979) .................................................................23

*Stirone v. United States*,
    361 U.S. 212 (1960) ...................................................... 36, 37, 38

*United States v. Bertolotti*,
    529 F.2d 149 (2d Cir. 1975) .....................................................28

*United States v. Carpenter*,
    791 F.2d 1024 (2d Cir. 1986) ...................................................25

*United States v. Chavez*,
    549 F.3d 119 (2d Cir. 2008) .....................................................40

*United States v. Coplan*,
    703 F.3d 46 (2d Cir. 2012) .......................................................40

*United States v. Criollo*,
    962 F.2d 241 (2d Cir. 1992) .....................................................47

*United States v. D'Amelio*,
    683 F.3d 412 (2d Cir. 2012) ............................................ 34, 35

*United States v. Escotto*,
    121 F.3d 81 (2d Cir. 1997) .............................................. 48, 55

*United States v. Finnerty*,
    533 F.3d 143 (2d Cir. 2008) ............................................ 42, 44

*United States v. Geibel*,
    369 F.3d 682 (2d Cir. 2004) .....................................................26

*United States v. Johansen*,
    56 F.3d 347 (2d Cir. 1995) .............................................. 26, 28

iv

*United States v. Jones*,
   16 F.3d 487 (2d Cir. 1994) ................................................................23

*United States v. Kaplan*,
   490 F.3d 110 (2d Cir. 2007) ...................................................... 34, 38

*United States v. Martin Linen Supply Co.*,
   430 U.S. 564 (1977) ..................................................................... 48, 53

*United States v. McDermott*,
   245 F.3d 133 (2d Cir. 2001) ...................................................... *passim*

*United States v. McDermott*,
   277 F.3d 240 (2d Cir. 2002) ................................................................26

*United States v. Mollica*,
   849 F.2d 723 (2d Cir. 1988) ...................................................... 34, 36

*United States v. Moye*,
   454 F.3d 390 (4th Cir. 2006) ..............................................................47

*United States v. O'Hagan*,
   521 U.S. 642 (1997) ......................................................... 41, 42, 43, 44

*United States v. Patino*,
   962 F.2d 263 (2d Cir. 1992) ................................................................34

*United States v. Reyes*,
   302 F.3d 48 (2d Cir. 2002) ..................................................................23

*United States v. Rivera-Santiago*,
   107 F.3d 960 (1st Cir. 1997) ..............................................................54

*United States v. Salmonese*,
   352 F.3d 608 (2d Cir. 2003) ................................................................37

*United States v. Smith*,
   198 F.3d 377 (2d Cir. 1999) ................................................................55

*United States v. Spoor*,
   904 F.3d 141 (2d Cir. 2018) ................................................................34

*United States v. Stirone*,
   168 F. Supp. 490 (W.D. Pa. 1957) ....................................................37

*United States v. Svoboda*,
   347 F.3d 471 (2d Cir. 2003) ................................................................56

*United States v. Tzolov*,
    642 F.3d 314 (2d Cir. 2011) .................................................... 55, 56, 58

*United States v. Urciuoli*,
    513 F.3d 290 (1st Cir. 2008) .............................................47

*United States v. Yannotti*,
    541 F.3d 112 (2d Cir. 2008) .............................................40

*Yates v. United States*,
    354 U.S. 298 (1957) ...........................................................47

## Statutes & Other Authorities:

U.S. Const. amend. V, cl. 1. A ...............................................33

U.S. Const. amend. VI .................................................. 22, 48, 55

15 U.S.C. § 78aa ........................................................... 23, 55

15 U.S.C. § 78ff ......................................................... 1, 55, 58

15 U.S.C. § 78j(b) ..................................................... 1, 55, 58

18 U.S.C. § 371 .................................................................1

18 U.S.C. § 1349 ...............................................................1

18 U.S.C. § 1956(h) ...........................................................1

18 U.S.C. § 3551 ...............................................................1

28 U.S.C. § 1291 ...............................................................1

17 C.F.R. § 240.10b-5 .................................................. 41, 44, 45

Fed. R. Crim. P. 18 ..........................................................55

## JURISDICTION AND TIMELINESS

The district court had subject matter jurisdiction pursuant to 18 U.S.C. §§ 371, 1349, 1956(h) and 3551 *et seq* and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78ff. This appeal is from a final judgment of conviction entered on March 21, 2019. SPA-1. Mr. Korchevsky filed his Notice of Appeal on March 26, 2019, App. 851–52, giving this Court jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Did the government's failure to prove the single conspiracy alleged in the Superseding Indictment create the potential for substantial prejudice against Mr. Korchevsky?

2. Did the government's substantial change between the Superseding Indictment and the evidence at trial in the type, number, and scope of the allegedly illegal trades constitute a constructive amendment of the Superseding Indictment or a variance that substantially prejudiced Mr. Korchevsky?

3. Did the government fail to prove an essential element of securities fraud for Counts Three and Four of the Superseding Indictment when it claimed that the defendants owed a duty to disclose material non-public information to potential purchasers even though that information had not been gained by a breach of fiduciary duty?

4. Did the trial court improperly prejudice a contested factual issue by adopting the government's suggested response to the jury's inquiry during deliberations regarding a critical piece of evidence?

5. Was venue proper in the Eastern District of New York for the alleged securities fraud violations despite the lack of evidence that a specific illegal trade, transaction, or event took place, or could have reasonably been expected to have taken place, within that district?

## STATEMENT OF THE CASE

This appeal arises out of an insider trading case in which Vitaly Korchevsky and Vladislav Khalupsky were accused of being part of a conspiracy that hacked various newswires to obtain pre-release copies of quarterly earnings reports and then traded on this material non-public information. App. 85. According to the government, a group of computer hackers in various overseas locations broke into newswire computers and sent the earnings reports to middlemen, who in turn recruited traders to consummate stock purchases based on that information before its release. App. 85–88. Although the government found no evidence of the stolen releases on any of Mr. Korchevsky's electronic devices when it searched his house, the government claimed that a "pattern" of suspicious trades and the testimony of the middlemen in the scheme, who pled guilty to a single count of wire fraud in exchange for their cooperation, proved Mr. Korchevsky's involvement.

After a three-week jury trial in the United States District Court for the Eastern District of New York, the jury found both Mr. Korchevsky and Mr. Khalupsky guilty on all three of the conspiracy counts as well as the two substantive securities fraud counts set forth in the Superseding Indictment. App. 752–56, 835–37. Mr. Korchevsky was sentenced to five years on each count to run concurrently, SPA-3, as well as a forfeiture of $14,452,245.00, SPA-14–15, restitution of $339,062.99, App. 865, and a fine of $250,000.00, SPA-8. The final

judgment was entered by Judge Raymond J. Dearie on March 21, 2019, SPA-1, and a Notice of Appeal was filed on March 26, 2019, App. 851–52.

## I. THE INSIDER TRADING SCHEME AS ALLEGED IN THE SUPERSEDING INDICTMENT.

Mr. Korchevsky, along with three other defendants, was initially indicted on August 5, 2015, in the Eastern District of New York for his alleged involvement in an insider trading scheme. App. 55–79. Prior to the unsealing of the indictment, FBI agents orchestrated several surprise raids, including at the home of Mr. Korchevsky. App. 200–01. They arrested Mr. Korchevsky and seized all his cell phones, iPads, and computers. App. 200–13.

The government filed a Superseding Indictment more than a year later after obtaining guilty pleas from two of the defendants in the instant case, App. 195, as well as the two "Middlemen," Igor and Arkadiy Dubovoy, who pled guilty in a related case in the District of New Jersey. App. 216, 263–64, 271, 330.

The Superseding Indictment contained five counts each against Mr. Korchevsky and Khalupsky: Conspiracy to Commit Wire Fraud (Count 1), Conspiracy to Commit Securities Fraud and Computer Intrusions (Count 2), Securities Fraud with regard to the PR Newswire hack (Count 3), Securities Fraud with regard to the Marketwired Hack (Count 4), and Conspiracy to commit Money Laundering (Count 5). App. 93–98.

Under a section labelled "The Hacking of the Victim Newswires,"[1] the government claimed that the Hackers accessed PR Newswire "through the use of malware," ("[t]he Hackers sent unauthorized PHP commands to the PR Newswire servers"), that they accessed Business Wire's servers by "bruting" the servers, i.e. using brute force attacks to decrypt the passwords, and accessed Marketwired's networks using SQL attacks. App. 87–88.[2] Though the Superseding Indictment listed Business Wire as a "Victim Newswire," it contained no substantive securities fraud count related to the alleged hacking of Business Wire.

Under a section entitled "Sharing the Stolen MNPI," the government claimed that defendant Khalupsky had sent an email with an attachment containing screenshots of an unreleased Oracle quarterly earnings press release. App. 89. In addition, the Dubovoys had traded emails attaching information about upcoming embargoed press releases. *Id.* But with regard to Mr. Korchevsky, the government alleged only that Mr. Korchevsky sent Arkadiy Dubovoy an email stating that he [Mr. Korchevsky] "got the numbers right," but that the market's "reaction [was] mixed." App. 88. This same email was the only "overt act" cited against Mr.

---

[1] The three "Victim Newswires," as defined in the Superseding Indictment, were PR Newswire Association, LLC, ("PR Newswire"), Marketwired L.P. ("Marketwired") and Business Wire.

[2] The Superseding Indictment alleges that the Hackers "attempted to gain access" to the Victim Newswires through "various methods, such as phishing attempts and the surreptitious infiltration of servers that the Victim Newswires leased from data storage providers. App. 87. But in terms of actually "gaining access," the Government alleges that this was accomplished through "sophisticated intrusion techniques, such as SQL injection and brute force attacks." App. 85–87.

Korchevsky in furtherance of the government's alleged securities' fraud conspiracy. App. 95.[3]

The "Target Companies" were listed by name in paragraph 13 of the Superseding Indictment. App. 82–83. Those ninety-one companies all reported their earnings on either PR Newswire or Marketwired with the exception of five trades. *Compare id.*, *with* App. 778 (a list of Mr. Korchevsky's trades and the newswires on which they posted earnings).[4]

Based on the Superseding Indictment, defense counsel reviewed more than a million documents and prepared for a case focused on the Target Companies that released earnings reports on PR Newswire and Marketwired during the time period between 2011 and 2014.

## II. "YOU DON'T CONVICT ON SMOKE."

On June 16, 2017, defense counsel filed a Motion for a Bill of Particulars, App. 104–05, requesting, among other things, that the government provide "a

---

[3]  It is undisputed that Mr. Korchevsky was an "earnings trader" who conducted trades for both himself and the Dubovoys. App. 232–33, 453. As such, Mr. Korchevsky would try to discern, based on available data, whether a company would be reporting positive or negative earnings news and trade accordingly. An email from Mr. Korchevsky stating that he "got the numbers right" but that the market's reaction was "mixed" is hardly surprising or damning. On the contrary, it would be strange for Mr. Korchevsky to report that he got the "numbers right" if the Dubovoys had already provided him with "the numbers." At trial, even Igor Dubovoy, admitted as much: "Q: [I]t's clear from this email, isn't it, Mr. Dubovoy, that [Mr. Korchevsky] possessed no inside or nonpublic information; isn't that true? A: From this email, yes. Q: Right. A: It doesn't show that there's any nonpublic information." App. 269.

[4] Exhibit 8002 was a government excel spreadsheet that contained all of Mr. Korchevsky's trades between 2009–2015 (as well as trades of the other alleged coconspirators). A disc containing that spreadsheet has been provided as Exhibit 8002. *See* App. 778.

complete listing of the particular stocks and trades the government contends were made based on inside information." App. 124. That same month, defense counsel submitted an omnibus pre-trial motion arguing for dismissal of the securities fraud counts because the government failed to adequately allege essential elements of the charged crimes, and dismissal of Counts Two, Three and Four as either duplicitous or multiplicitous. App. 133.

The court overruled the dispositive motions and, following a status conference at which the bill of particulars was discussed, the parties agreed to try to work through defense counsel's request. App. 161. But as trial approached, defense counsel remained concerned that after two years and ten months of pre-trial preparation, they still did not know which specific trades the government would claim were actually illegal. The precursor to Government Exhibit 8002 contained nearly two thousand trades for Mr. Korchevsky, *see* App. 778 (spreadsheet tab "K"), some of which were not within the time frame of the alleged conspiracy or "inside the window," i.e. trades that took place between the time the Newswires received the press releases and the public release of the information.

Just two weeks before trial, defense counsel renewed its request for a list of the specific trades the government claimed were illegal: "[E]ssentially what the government has disclosed to us is we're not going to tell you what the specific trades are." App. 177.10

The Court noted it was "not an unreasonable question" and reminded the government that "[y]ou don't convict on smoke." App. 177.11 The government, however, said that *all* trades on its voluminous list were "suspicious" and that, given the conspiracy counts, "we wouldn't actually need to flag a single trade to convict him of those crimes." App. 177.11.

But the Superseding Indictment contained more than just conspiracy counts and the Court was not swayed. "I do not want this to linger. . . If you have specific trades that you are going to attempt to prove were illegal, not suspicious but manifestation of the conspiracy itself, give them a list of those trades and let's have it done with." App. 177.14.

The government protested, claiming that it was an "enormous burden" and "unfair" to make the government "try our case for counsel a week before we begin." App. 177.17. Besides, the government argued, it was the statistical pattern that mattered, and it did not intend "to take the position at trial that each and every one of those thousands of trades was, in fact, based on material non-public information." App. 177.16.

In response, the Court stated the obvious: "[Y]ou've accused him of making illegal trades. At a minimum, he should know what trades you are accusing him of making." App. 177.17. The government was instructed to provide a list—a subset

of the more than a thousand "suspicious trades"—that the government claimed were actually illegal. *Id.*

Seven days before trial, the government provided its list. App. 178–90. But now, instead of the ninety-one stocks alleged in the Superseding Indictment, the new list, referred to by the government as the "Highlighted Trades," contained 221 stocks and 276 trades. *Id.* Stunningly, *only twenty-six of the 221* companies on the new list were among the "Targeted Companies" in the Superseding Indictment. *Compare* App. 180–90, *with* App. 81–83. Nearly ninety percent of the stocks were new; nearly ninety percent of the allegedly illegal trades were not even for stocks listed in the Superseding Indictment.

The timing of the alleged trades also varied dramatically from the Superseding Indictment. The Targeted Companies listed in the Superseding Indictment were virtually all traded between 2011 and 2014; by contrast, the new list of Highlighted Trades was weighted heavily toward 2015, with more than sixty percent of the trades occurring in that year alone. App. 180–90. And nearly two-thirds of the Highlighted Trades were for stocks that had reported earnings through Business Wire, a wire service that was not the subject of a substantive securities fraud count and that played a minimal role in the Superseding Indictment. *Id.*

In a letter, defense counsel argued that the government had not complied with the Court's ruling by presenting such a broad array of allegedly illegal trades.

App. 191–92. The Court disagreed. App. 36. ("The Court simply does not understand the claim of unfairness. Enough letter writing. Prepare for trial.").

Despite providing the Highlighted Trades a week prior to trial, the government never introduced that list (or any subset of it) as an exhibit at trial. Instead, as will be shown below, the government again broadened its approach, questioning its expert about a pattern of 850 trades listed on Government Exhibit 8002. *Compare* App. 778, *with* App. 180–90. Though the government's expert testified about a few examples of individual stocks, he insisted that the "pattern" of the entire list contained indicia of guilt. App. 388 ("[t]his is a statistical analysis so it doesn't look at any particular one trade at a time . . . [but] at a pattern of trading and that's what my analysis is about").

## III.    THE TRIAL AND SENTENCING

After the government presented its evidence at trial, the defendants made Rule 29 Motions based on lack of venue, constructive amendment, insufficiency of the evidence, and the duplicity of Count Two. App. 437–437.4. The Court overruled those motions, App. 437.3–437.4, and, after more than three weeks of testimony, the jury found Mr. Korchevsky guilty on all counts. App. 752–56, 835–37.

At sentencing, the court heard evidence of Mr. Korchevsky's strong character. Mr. Korchevsky's father was persecuted "for most of his life for preaching" in the former Soviet Union and Mr. Korchevsky himself "was put in prison" for "transporting Bibles." App. 844. Since gaining asylum in the United States more than twenty years ago, Mr. Korchevsky and his wife have sponsored thirty-eight refugee families, taking responsibility for them, allowing them to live in their home, providing financial assistance, and providing assistance in securing employment. App. 842. He served sacrificially as a pastor, helping people who could never return the favor. App. 843 ("we just did what we thought was right based on what we believe").

Impacted by this lifetime spent serving others and hundreds of letters of support, the trial court called Mr. Korchevsky "a good man" and noted his "selfless" good works and generosity. App. 848. Nevertheless, the court sentenced Mr. Korchevsky to five years on each count to run concurrently, SPA-3, as well as forfeiture, restitution and fines in the amounts set forth above. SPA-8.

## STATEMENT OF FACTS

## I.    TRADING BY MR. KORCHEVSKY PRIOR TO THE ALLEGED INSIDER TRADING SCHEME.

Mr. Korchevsy was an earnings trader hired by Arkadiy Dubovoy to trade in his account beginning in the year 2000 for a few years and then again beginning in 2010. App. 229–31. Igor Dubovoy, the son of Arkadiy, testified that he helped

manage his father's account because his father was not "computer literate." App. 218. Igor testified that he would send Mr. Korchevsky passwords and log-in information for the various financial accounts and servers that could access those accounts from anywhere in the world. App. 246–47. In the year 2010, before Mr. Korchevsky's alleged participation in the conspiracy, Igor Dubovoy characterized Mr. Korchevsky's trading performance as "very good…there were profits generated on a daily basis." App. 231. As an earnings trader, Mr. Korchevsky would typically trade just prior to the release of earnings news. App. 231–34, 454, 804. At times, Mr. Korchevsky would make the wrong call but "overall, yes, it was profitable." App. 232.

Mr. Michael Mayer, a financial consultant at Charles River Associates, confirmed that Mr. Korchevsky was a very successful earnings trader before the alleged conspiracy began with returns of over 100% in 2009 alone. App. 441, 457. In addition, using the database constructed by the government's expert witness, Mr. Mayer determined that in the "unaccused trading period" Mr. Korchevsky's trading pattern was essentially the same as it was during the alleged conspiracy— the vast majority of his trades took place late in the day, just before earnings were announced (87% in the unaccused trading period versus 79% in the accused trading period), and he risked roughly the same percent of his portfolio on those trades during the two periods. App. 805–07. As a result of this trading pattern that

took advantage of getting as much information as possible before the market closed and earnings were released, 93% of Mr. Korchevsky's trades during the unaccused period took place during the "window" between the time a company's quarterly release was sent to a newswire and the time it became public. App. 811.

## II. THE TESTIMONY OF THE GOVERNMENT'S COOPERATING WITNESSES.

The two masterminds of the alleged scheme, Igor and Arkadiy Dubovoy, testified for the government under a plea deal. App. 263–64, 270–72, 329–30. They pled guilty to one count of wire fraud and the government dropped six other wire fraud charges, seven securities fraud charges and a money-laundering charge. App. 270–72. In addition, the expectation was that Arkadiy and Igor would receive a letter from the government to their sentencing judge letting him or her know that the they had provided significant information for this case.[5] App. 263–64. However, that aspect of the deal may be in jeopardy because the government learned, during the cross-examination of the Dubovoys at trial, about bank fraud that had not been previously disclosed. App. 362–63 ("altering bank documents").

The governments' primary witnesses were hardly paragons of virtue. Arkadiy admitted that he and Igor altered documents for real estate purchases ("we showed that we had money in accounts when there was no money"), committed

---

[5] Neither of the Dubovoys have been sentenced yet.

bank fraud, falsified records for building management to make it look like they had performed more services, took money from partnerships without informing the partners, and cheated the Hackers in this scheme by opening up and trading in accounts the Hackers did not know about. App. 360–63, 365–68, 372–73.

Nevertheless, the government relied on the Dubovoys' testimony in its attempt to show that Mr. Korchevsky had access to information obtained by the Hackers. Arkadiy Dubovoy claimed he and a partner met with Mr. Korchevsky twice before Mr. Korchevsky agreed to join the conspiracy in 2011. App. 339, 346. Both Arkadiy and Igor testified about buying Mr. Korchevsky a computer, an iPad and a phone with which to conduct the illegal trades. App. 246–47, 347–48. Igor Dubovoy claimed that he would forward stolen press releases to Mr. Korchevsky, App. 258–59, or give Mr. Korchevsky access to email accounts where the press releases were stored, App. 261. Despite these claims, and even though the government pulled off a surprise raid on the Dubovoys and Mr. Korchevsky, coinciding with their arrests, it produced no evidence of any press releases found on the devices in Mr. Korchevsky's possession. App. 155. The same was not true of the Dubovoys and Khalupsky. *See, e.g.*, App. 423–25.

In its closing, the government claimed that, notwithstanding this lack of direct evidence against Mr. Korchevsky, there was circumstantial evidence that he had accessed two accounts where stolen press releases were housed. First, they

noted that an iPad seized from his house in 2015 showed a series of four email messages to a "stargate" account sent three years earlier. App. 479. However, the evidence at trial showed that the iPad had been purchased by one of Arkadiy Dubovoy's work associates and given to Mr. Korchevsky later. App. 347–48, 377–79. The evidence also showed that the Dubovoys used that iPad for a skype session months after the stargate messages, indicating that it was still in their possession at the time of the messages on July 30, 2012. App. 318–20.

Second, the government contended that the password to a "loscal" site was sent by Igor Dubovoy to Mr. Korchevsky in 2015. App. 261.1–261.3. But there is no evidence that Mr. Korchevsky either received that text message or accessed that site.

### A.    The time frame for the alleged conspiracy.

Though the government's cooperating witnesses claimed that the conspiracy lasted from sometime in 2011 through the middle of 2015, they both testified that there were substantial periods of time when they could not access confidential information from the Hackers. App. 254, 357 (lack of access "happened often, many times"). In fact, from the middle of 2012 until December of that year, and for virtually all of 2014, the government's witnesses claimed that they did not have access to inside information. According to the Dubovoys, Arkadiy sent Mr. Korchevsky one million dollars on or about June 30, 2012, for trading in Mr.

Korchevsky's account because it had higher margins. App. 240, 358–59. Arkadiy Dubovoy testified that nearly six months later, on December 12, 2012, he asked for the money to be returned because "we didn't have information back then. It was just laying there for a certain period of time and nothing came of it." App. 359.

In addition to the time during 2012 when the Duvoboys said they did not have "information," Igor Dubovoy also testified that the information stopped coming "somewhere end of 2013, beginning of 2014," App. 256, and did not resume until "probably late 2014, early 2015," App. 257.

### B.     The evidence of multiple conspiracies.

The Dubovoys engaged multiple traders in multiple accounts as part of their scheme, but kept them all in the dark so they would not know that other traders were involved:

Q: As far as you know, did Korchevsky know about Khalupsky?

A: I didn't say anything, I don't know.

Q: As far as you know, did Mr. Khalupsky know about Mr. Korchevsky?

A: No.

Q: You were intentionally trying to keep them away from each other?

A: Yes.

Q: Explain that?

> A: We wanted to see who was better at trading. And to introduce Khalupsky to Korchevsky, they are different people, they have different interests.

App. 351–52.

Despite his claim that Mr. Korchevsky had access to the same stolen press releases as Khalupsky, Igor Dubovoy admitted that, from 2010–2015, Khalupsky was generating "significantly better" returns than Mr. Korchevsky. App. 238–39. He also stated that in 2015, when Mr. Korchevsky allegedly had access to inside information, the Dubovoys suffered "significant losses" with Mr. Korchevsky and, based on "the overall performance of the account," decided to stop the trading. App. 265–67.

Mr. Yaroslav Zayats, a man who knew both Arkadiy Dubovoy and Mr. Korchevsky and had, in fact, been asked by Arkadiy to become business partners, testified for the defense. App. 437.5 A year-and-a-half before trial he met with Arkadiy Dubovoy and, because he had heard that Mr. Korchevsky was arrested, asked: "[D]id you really give [Vitaly] some information and did he know about it?" App. 437.6, 437.10. Arkadiy Dubovoy "categorically denied that. He says if I had given him information, and I told him so, that information was illegally obtained. He would have stopped doing business with me." App. 437.10.

### III. KORCHEVSKY'S TRADING FROM 2011–2015.

The government's primary expert was Dr. Eugene Canjels, a financial economist who reached four conclusions about Mr. Korchevsky's trading: (1) that after January 2011, Mr. Korchevsky's trading started becoming "highly profitable;" (2) that Mr. Korchevsky generally traded after a quarterly news releases were uploaded to a newswire but before they were released to the public; (3) that Mr. Korchevsky's trading was very similar to Arkadiy Dubovoy's trading; and (4) that Mr. Korchevsky's trading focused on stocks that reported earnings on the particular newswire that the Hackers were able to access during that period of time. App. 385–86. On cross-examination, Canjels testified that he was not saying any particular trades were illegal, but that the overall pattern of trading between 2011 and 2015 supported his conclusions. App. 388.

In considering the "pattern" of stock trades between 2011 and 2015, Canjels did not exclude the time periods after January of 2011 when the cooperating witnesses admitted they did not have access to inside information. *See* App. 779–801. Instead, he simply looked at the entire pattern from 2011–2015 and compared it to the pattern for 2009–2010.

To support his first opinion, Canjels constructed a spreadsheet, *see* App. 778, containing all of Mr. Korchevsky's trades from 2009 through 2015 and a corresponding chart showing that Mr. Korchevsky was far more profitable during

the 2011–15 time frame than the 2009–10 time frame, *see* App. 780. However, this chart, showing gross profit, was skewed by one highly profitable trade that Mr. Korchevsky made in 2011, dramatically increasing the value of his account in a way that correspondingly increased the amount he was willing to place on future trades. That trade was the short sale of a company named Dendreon Corporation (ticker symbol "DNDN") on August 3, 2011. *See* App. 802. Mr. Korchevsky began shorting the stock at 3:56 p.m. and, after the quarterly earnings report was released a few minutes later, the stock tanked. *Id.* On this one stock, Mr. Korchevsky made $2,335,198 on an investment of $217,802, a return of 1072% in a single day. *Id.* This trade doubled the amount in his account, dramatically impacted his profitability for 2011, and gave him more capital to place on future trades. It is not surprising that this trade was highlighted by the government in its Superseding Indictment and by Canjels in his testimony.

But at the time of the DNDN trade, as was his practice, Mr. Korchevsky was trading in both his own account and Arkadiy Dubovoy's account. Yet on this particular trade, none of Mr. Dubovoy's traders, including Mr. Korchevsky, traded in DNDN in any of Dubovoy's accounts. If the DNDN trade was based on insider information provided by Arkadiy Dubovoy, one is left to wonder why that stock was never traded in any of his various accounts.

Moreover, when one compares all of Mr. Korchevsky's trades during the accused period with the earnings trades on which he is accused of having inside information, his success rate is virtually the same. App. 817 (65% versus 66%).

Canjel's second opinion—that Mr. Korchevsky generally traded in stocks after the earnings reports were uploaded—is true but also little different from prior years. In order to accumulate as much information as possible and eliminate intraday market fluctuations, earnings traders typically wait to trade until the last few minutes before the market closes on the day the earnings will be released. Accordingly, an earnings trader will almost always be trading in "the window." Thus, Mr. Korchevsky's trades in 2009–10 were in the window 93% of the time, a percentage not significantly different than the 98% for the following four years. App. 810–11.

Canjel's third opinion, that Mr. Korchevsky's account reflected the same types of trades as Mr. Dubovoy's accounts 57.9% of the time, is even less remarkable. Though Canjels places significance on this factor because he would expect only 1.1% of the trades to overlap if there were no "correlation," the "correlation" here results from the fact that Mr. Korchevsky was trading in both his own account and, as one of Dubovoy's investment traders, in Arkadiy Dubovoy's account. App. 459–60 ("you would expect if somebody's trading in two accounts

[that they would] trade similarly"). Thus, these "correlated" trades reflected trades made by Mr. Korchevsky in both accounts, a process that was entirely legal.

Canjel's final opinion was that Mr. Korchevsky's trades would typically focus on companies that reported on one newswire for a period of time and then he would change to companies that reported on a different newswire, tracking the Hackers' alleged access to the newswires. App. 386. However, that trading pattern did not line up with the testimony from newswire witnesses as to when they were hacked.

For example, the government called Bret Padres, the CEO of Mandient, to testify about his work when he was brought in to analyze a data breach at PR Newswire in March of 2012 and again in January of 2013. App. 296–97, 299, 302–03. He testified that someone gained access to the PR Newswire server beginning in July 2010 and continued through January 2011. App. 301. But he also testified that there was *no evidence* of unauthorized access after January 22, 2011. App. 304–05. Despite this testimony, Canjel's chart claims that there was a spike in Mr. Korchevsky's trades with companies that reported on PR Newswire in July 2011 that continued through April 2012, a timeframe excluded by Padres. *Compare* App. 779–802, *with* App. 304–05.

Nevertheless, based largely on this circumstantial "pattern" evidence from Canjels and the testimony of the Dubovoys, the jury convicted Mr. Korchevsky on three counts of conspiracy and two counts of securities fraud. App. 835–37.

## SUMMARY OF ARGUMENT

"It's beyond my—beyond my capability to reconcile that, frankly. It's beyond me." App. 848–49.

Those were the words of the trial judge at the sentencing hearing as he tried to reconcile Mr. Korchevsky's lifetime of good works with the crimes for which he had just been convicted. The facts, as the trial court noted, are difficult to reconcile. But on the law, the government's theories are *impossible* to reconcile with the evidence it introduced at trial, this Court's precedent, or the undergirding constitutional principles on which that precedent is built.

First, the government's single conspiracy theory, articulated in its Superseding Indictment and re-iterated in its closing argument, cannot be reconciled with the testimony of the government's own witnesses. The government grounded its case on the testimony of two witnesses, the masterminds of the scheme who pled guilty to a single count of wire fraud in exchange for their cooperation. App. 270–72. But those witnesses testified that they orchestrated multiple conspiracies, not one conspiracy, consisting of different traders such as Korchevsky and Khalupsky. App. 351–52. Despite this evidence, the government

21

insisted on trying Korchevsky and Khalupsky together, resulting in substantial spillover evidence against Korchevsky that would not have improperly prejudiced the jury if he had been tried alone.

Second, the government's proof at trial cannot be reconciled with the Constitution's Grand Jury Clause, which guarantees defendants the right to be tried on the charges and evidence set forth by the grand jury. At trial, the government so dramatically changed the type, number, and scope of the allegedly illegal trades that the stocks actually listed in the Superseding Indictment became irrelevant and Mr. Korchevsky was convicted based on a "suspicious" pattern of trading rather than specific illegal trades.

Third, the government's security fraud claims cannot be reconciled with Supreme Court authority holding that an investor has no duty to disclose non-public information to potential purchasers (the alleged victims under Counts Three and Four) unless that information was obtained by breach of a duty against the source. *Chiarella v. U.S.*, 445 U.S. 222, 236 (1980).

Fourth, the trial court's endorsement of the government's interpretation of a fiercely contested factual issue in response to a jury inquiry cannot be reconciled with Mr. Korchevsky's Sixth Amendment right to have a jury resolve all factual disputes.

And fifth, the government's lack of evidence that even a single trade occurred in the Eastern District of New York cannot be reconciled with the specific venue provision of the Securities Fraud statute that requires proceedings be brought "in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa.

For these reasons this Court should reverse and vacate Mr. Korchevsky's convictions and enter judgment in his favor on the sufficiency claims or, in the alternative, remand on the evidentiary claims for a new trial in a proper venue.

## LAW AND ARGUMENT

## I. THE GOVERNMENT FAILED TO PROVE A SINGLE CONSPIRACY INVOLVING BOTH DEFENDANTS.

### A. Legal standards.

Asserting that the government failed to prove a single conspiracy is, at its essence, a sufficiency challenge, which this Court reviews *de novo. United States v. Reyes*, 302 F.3d 48, 52–53 (2d Cir. 2002). Viewing the evidence in the light most favorable to the government, a defendant must show that "no 'rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.'" *United States v. Jones*, 16 F.3d 487, 490 (2d Cir. 1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

This Court has addressed this issue in an insider trading case similar in all critical respects to the case at hand. *United States v. McDermott*, 245 F.3d 133 (2d

Cir. 2001), involved James McDermott, the CEO of an investment bank that

specialized in mergers and acquisitions, Kathryn Gannon, with whom McDermott

was having an affair, and a man named Anthony Pomponio, one of Gannon's other

lovers. *McDermott*, 245 F.3d at 135–36. Using inside information about upcoming

mergers and acquisitions, McDermott made stock recommendations to Gannon

who, without informing McDermott, also passed them on to Pomponio. *Id.* at 136.

McDermott and Pomponio were tried together, "but Gannon was not

present." *Id.* The indictment contained a conspiracy count alleging a single

conspiracy and additional substantive securities fraud counts. *Id.* at 137–38. The

evidence against McDermott included the following: (1) McDermott and Gannon

were having an affair; (2) Gannon, an amateur trader, opened an account funded by

McDermott; (3) during the alleged conspiracy Gannon traded twenty-one times in

twelve different stocks recommended by McDermott; (4) many of the trades were

in non-blue chip stocks that were the subject of non-public negotiations being

handled by McDermott's company; (5) the trades were quite successful; (6) phone

calls between McDermott and Gannon coincided with trading activities; and (7)

Gannon shared her recommendations with Pomponio. *Id.* at 138.

The government presented a similar circumstantial case against Pomponio

but also introduced audio recordings of Pomponio's deposition in a related SEC

case. *Id.* at 136.Those recordings significantly undermined his credibility as they

"recorded him poorly telling lies, evading questions and affecting incredulous reactions." *Id.* McDermott, however, did not know about Pomponio's existence, much less that Pomponio had participated in the conspiracy. *Id.*

Ultimately, this Court ruled that McDermott was entitled to a new trial based on the government's failure to prove a single conspiracy unless one of three exceptions could be shown. *Id.* at 137–38 (citing *United States v. Carpenter*, 791 F.2d 1024 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987)). First, that the scope of the trading agreement between the parties had been broad enough to include trading by or for persons other than the known conspirators. *Id.* at 138. Second, that the unknown trader was "part of the ramifications of the plan which could…be reasonably [foreseen] as a necessary or natural consequence of the unlawful agreement." *Id.* Third, that the defendant had actual knowledge of the other conspirator's existence or the relationship with the other conspirators. *Id.* None of the exceptions applied and this Court held, as a matter of law, that no rational jury could find McDermott guilty beyond a reasonable doubt of a single conspiracy with Pomponio to commit insider trading. *Id.*

When the proof at trial is insufficient to prove the single conspiracy alleged, as was found in *McDermott*, this Court must also "review the variance for its potential prejudicial effect on [the defendant's] trial" as a whole. *Id.* at 139. If the variance caused potential for "substantial prejudice" on any other counts, those

convictions must also be vacated. *See United States v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995). Absent the potential for substantial prejudice, the variance is harmless error.

Thus, in *McDermott II,* a follow-up appeal brought by Pomponio, this Court held that Pomponio could not show the potential for substantial prejudice from being tried with McDermott and affirmed Pomponio's convictions. *United States v. McDermott*, 277 F.3d 240, 242 (2d Cir. 2002); *accord United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004) (the variance between indictment and proof on single conspiracy is "subject to the harmless error rule").

In making a determination regarding substantial prejudice, the Court should consider the following factors: "(1) whether the court gave a *Pinkerton* charge; (2) whether statements of persons not in the conspiracy were used against the defendant; (3) whether there was prejudicial spillover due to a large number of defendants; and (4) whether any inflammatory or shocking evidence came in against the [other] defendant." *See McDermott*, 245 F.3d at 139. Under the right circumstances, even the presence of a single factor can create substantial prejudice. *Johansen*, 56 F.3d at 351–52.

**B.** **The government's primary witness claimed there were multiple conspiracies and the government introduced no evidence to dispute that testimony.**

Though Counts One, Two, and Five allege a single conspiracy involving both defendants, other traders, and Middlemen, App. 93–94, 98, the government failed to prove the existence of a single conspiracy involving both Mr. Korchevsky and Mr. Khalupsky. Instead, the government's own cooperating witness, and the Middleman for the alleged conspiracy, Arkadiy Dubovoy, testified that he "intentionally [tried] to keep them away from each other," crafting multiple *distinct* conspiracies, one involving Khalupsky and one allegedly involving Korchevsky, in order to see which of the brokers "was better at trading." App. 351–52. No other government witnesses contradicted him. Thus, the only evidence presented on the issue at trial directly disproved the government's allegations in its Superseding Indictment about a single conspiracy.

Like Kathryn Gannon in the *McDermott* case, the Dubovoys had a reason to conceal the identity of their alleged co-conspirators from each other. Moreover, none of the exceptions enumerated in *McDermott* would apply here.

As to the first exception, there was no testimony that the Dubovoys and Mr. Korchevsky agreed the conspiracy would include other traders. Second, Mr. Korchevsky was not in a position where he could reasonably foresee such a development. On the contrary, Arkadiy Dubovoy testified that he set up separate

accounts so that Korchevsky and Khalupsky were not trading in the same account and therefore could not see each other's trades. App. 349. And third, the trial transcript was devoid of evidence that Mr. Korchevsky had actual knowledge of Khalupsky's existence. Accordingly, no rational jury could find that Mr. Korchevsky knowingly entered into a single conspiracy with another trader like Khalupsky. Instead, "the single conspiracy charge in the indictment 'was, in substance, a product of the Government's imagination.'" *See Johansen*, 56 F.3d at 351 (quoting *United States v. Bertolotti*, 529 F.2d 149, 155 (2d Cir. 1975)).

### C.   Being joined with Khalupsky at trial caused Mr. Korchevsky substantial spillover prejudice.

Because the proof at trial was insufficient to prove the single conspiracy alleged in the Superseding Indictment, this Court must also "review the variance for its potential prejudicial effect on [Mr. Korchevsky's] trial for the substantive counts of insider trading." *McDermott*, 245 F.3d at 139.

In *McDermott*, this Court applied the substantial prejudice factors, *see supra* p. 26, and held that the defendant had suffered "prejudicial spillover due to joinder" with an alleged co-conspirator not part of a single conspiracy. *Id.* Attempting to rescue its case against McDermott, the government noted that jurors were presumed to have followed limiting instructions telling them to judge the individual defendants solely on the evidence that applied to them. *Id.* But the Court held such instructions were insufficient to cure the prejudice. *Id.* at 139–40 ("the

presumption fades when there is an overwhelming probability that the jury will be called upon to perform humanly impossible feats of mental dexterity"). It was impossible to tell how much the evidence against Pomponio swayed the jury as it considered McDermott's fate, and this Court reversed the conviction against McDermott on both the conspiracy count and the substantive securities fraud count and remanded. *Id.*

The same result should follow here. A standard *Pinkerton* charge was given, *see* App. 667, a factor in favor of a new trial. Moreover, as in *McDermott*, two defendants (who were not part of a single conspiracy) were tried together, and the absence of other defendants served to highlight the evidence against Khalupsky and therefore "*increased* the prejudicial effect." *See McDermott*, 245 F.3d at 139 (emphasis in original). And, like *McDermott*, the prejudicial spillover evidence was substantial. It fell into four separate categories.

First, there was direct evidence tying Khalupsky to the insider trading scheme in the form of a stolen press release that he emailed from one of his accounts to another. App. 423. This became the lynchpin of the government's case against him and was highlighted eight separate times in the government's closing alone. *See* App. 468, 473, 475, 514, 522, 524–26, 532. It was the government's smoking gun, something they characterized as "really damning evidence that

Khalupsky had access to press releases prior to them being out in the public. This is damning evidence that he had knowledge of this scheme." App. 525–26.

There was no such evidence against Mr. Korchevsky. Despite a surprise raid on his house and the confiscation of all of Mr. Korchevsky's computers and cell phones, despite an army of computer forensic technologists searching his hard drives, and despite the government's assertion that he must have had access to over a thousand stolen press releases, they could find not one of them on any of his devices.

The government therefore made every effort to associate Mr. Korchevsky with Khalupsky and the stolen press release by implication, even though the government's direct evidence belied such a link. For example, in its closing statement, the government argued that "[b]oth defendants are charged with co-conspiracy here, but really, it was just one single criminal conspiracy in operation with a bunch of different goals." App. 466. A few minutes later, in reciting the alleged evidence of this "single conspiracy," the government conflated the evidence, suggesting that the stolen Oracle press release was found in Korchevsky's email (it was not):

> Now, some of the reasons you know the defendants intended to participate in a criminal scheme is through communications that you saw between defendants and their co-conspirators in this trial, including text messages and emails . . . Khalupsky's statement that he knew the hackers, all of the electronic evidence from Korchevsky—that was

received from Korchevsky, and the photos of the Oracle press release that were found on these emails.

App. 467–68.

It was not just in its closing that the government attempted to associate Mr. Korchevsky with the stolen press release found on Khalupsky's email. Just before introducing the email that contained the Oracle release, the prosecution seemingly randomly asked the agent testifying if he had reviewed the indictment in this case. App. 422. After an affirmative response, the follow-up question reminded the jury that Mr. Korchevsky and Khalupsky were indicted together: "Q: And were both Vitaly Korchevsky and Vladislav Khalupsky on that indictment? A: Yes." *Id.* Immediately after reminding the jury that the two men had been indicted together, the prosecution then proceeded to ask about the exhibit containing the stolen press release that had been found on *only* Khalupsky's email. App. 422–25.

In addition to the "damning" email against Khalupsky, the government emphasized another "critical link" between Khalupsky and his co-conspirators that created potential for substantial prejudicial spillover against Mr. Korchevsky. Upon his arrest, Khalupsky, a Ukrainian trader, voluntarily admitted that he knew the Hackers were stealing press releases and trading on them:

Q:     What did Khalupsky say about hackers?

A:     He said that he knew the hackers in this case and that he believed they were still active.

Q: Did he say anything further with regard to his belief that they were still active?

A: Yes. He also mentioned that he believed they were still accessing press releases and that they were trading on that information.

App. 400.

By contrast, there was no evidence that Mr. Korchevsky knew or interacted with any of the Hackers and he has steadfastly maintained his innocence throughout, making no statement to the contrary. While the government went to great efforts to link Mr. Korchevsky to this conspiracy by circumstantial evidence, thus spending a large portion of its time going through Mr. Korchevsky's trades, it is the weight of the evidence, not the amount of time spent presenting it, that creates prejudicial spillover.

It was Khalupsky, not Korchevsky, who moved money internationally. App. 413–20. Khalupsky, not Korchevsky, who set up a maze of secretive international companies to hide the transactions. *Id.* Khalupsky, not Korchevsky, who had an accounting of the payments he made for the insider trading information. App. 758.

This is precisely the type of spillover evidence that would not have been admitted if Mr. Korchevsky had been tried separately. The jury heard weeks of testimony against both men together. During closing argument, the jury heard the government claim, despite its own evidence to the contrary, that this was "just one single criminal conspiracy." App. 466. It then heard the court's charge that the

reasonably foreseeable actions of one co-conspirator could be held against another co-conspirator. App. 667.

As this Court noted in *McDermott,* the jury would have had to "perform humanly impossible feats of mental dexterity" to parse the evidence and ignore all the evidence against Khalupsky when deciding Mr. Korchevsky's fate. *See McDermott*, 245 F.3d at 139–40. Like the SEC testimony of Pomponio in *McDermott*, Khalupsky's possession of the stolen press release, his admission that he knew the hackers were stealing press releases, and the other damning evidence against him invariably rubbed off on Mr. Korchevsky in the minds of the jury.

Because the government has failed to prove a single conspiracy, and because Mr. Korchevsky was unfairly prejudiced by the variance between the Superseding Indictment and the proof at trial, his conspiracy convictions should be vacated and dismissed and the substantive convictions vacated and remanded for a new trial.

## II.  BETWEEN THE SUPERSEDING INDICTMENT AND THE PROOF AT TRIAL, THE GOVERNMENT SO DRAMATICALLY CHANGED THE TYPE, NUMBER, AND SCOPE OF THE ALLEGEDLY ILLEGAL TRADES THAT IT CONSTRUCTIVELY AMENDED THE SUPERSEDING INDICTMENT OR, AT THE LEAST, CREATED A PREJUDICIAL VARIANCE THAT REQUIRES A NEW TRIAL.

### A.  Legal standards.

The Grand Jury Clause provides that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury." U.S. Const. amend. V, cl. 1. A constructive amendment is a *per se*

violation of this provision because it allows the petit jury to find a defendant guilty of a different crime than the one charged by the grand jury. *See United States v. Patino*, 962 F.2d 263, 265–66 (2d Cir. 1992).

Constructive amendment occurs when the proof at trial so varies from the facts alleged in the indictment that "there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. Spoor*, 904 F.3d 141, 152 (2d Cir. 2018) (quoting *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988)). A constructive amendment requires reversal. *Id.*

The key is whether the government has convicted "on a complex of facts distinctly different from that which the grand jury set forth in the indictment . . . or whether the indictment charged a single set of discrete facts from which the government's proof was at most a non-prejudicial variance." *United States v. D'Amelio*, 683 F.3d 412, 419 (2d Cir. 2012). A variance will also require reversal if the defendant shows that the variance: (1) prejudiced the defendant's substantial rights that indictments exist to protect—the right to be informed "of the charges against him so that he may prepare his defense and to avoid double jeopardy," *United States v. Kaplan*, 490 F.3d 110, 129 (2d Cir. 2007)—or (2) if the variance "caused the defendant 'substantial prejudice' at trial," *McDermott*, 245 F.3d at 139.

This Court examines whether such a constructive amendment or a variance has occurred *de novo*. *See D'Amelio*, 683 F.3d at 416. As will be shown below, the government, on the eve trial, so dramatically changed the alleged transactions that it claimed were illegal that it amounted to a constructive amendment of the Superseding Indictment or, at the very least, a prejudicial variance mandating reversal.

### B.     The nature of the variance.

As noted previously, the government indicted on a list of ninety-one "Target Companies" that it claimed were victimized by the alleged insider trading conspiracy. App. 82–83. On the eve of trial, in response to the Court's admonition to provide the precise trades it claimed were illegal, the government provided a new list of 221 "Highlighted Stocks," with only twenty-six of them overlapping the stocks listed in the Superseding Indictment. App. 178–90. At trial, even that new and expanded list was tossed aside, as the government instead claimed that the hundreds of stocks listed on Exhibit 8002 showed a "pattern" of illegal trading activity. App. 388.

The differences went beyond the list of companies allegedly involved. In the Superseding Indictment, virtually all the companies had been traded on PR Newswire and Marketwired; but at trial, the government also focused on Business Wire. *Compare* App. 82–83, *with* App. 778. In the Superseding Indictment,

virtually all the trades in the listed stocks had occurred between the years of 2011 and 2014; but at trial, a substantial number of the "pattern" trades took place in 2015. *Id.* In the Superseding Indictment, the only "overt act" that involved Mr. Korchevsky was an innocuous email he had written in 2013; but at trial, the government's cooperating witnesses claimed that Mr. Korchevsky had personally attended meetings where the conspiracy was discussed. App. 94–95, 339; 346.

In short, the government indicted on an alleged scheme that involved ninety-one stocks whose earnings were reported almost exclusively on two wires between the years of 2011–2014. But by trial, the list had expanded to hundreds of stocks with a "pattern" that included three wires and a substantial percentage of trades in 2015.

**C.** **The variance between the factual allegations in the Superseding Indictment and the evidence presented at trial substantially prejudiced Mr. Korchevsky.**

   *1.* *The variance so broadened the Superseding Indictment that it constituted a constructive amendment.*

As shown above, the government convicted "on a complex of facts distinctly different from that which the grand jury set forth in the indictment," thereby constructively amending the Superseding Indictment. *See Mollica*, 849 F.2d at 729. When a constructive amendment is shown, reversal is required. *Stirone v. United States*, 361 U.S. 212, 216–17 (1960).

In *Stirone*, the indictment charged the defendant with a violation of the Hobbs Act by unlawfully interfering with interstate commerce involving the importation of sand. *Id.* at 213–14. At trial, the court allowed the government to offer evidence of the defendant's conduct with regard to steel shipments under the same provisions of the Hobbs Act. *Id.* The district court denied defendant's motion for a new trial, holding that "[a] sufficient foundation for introduction of both kinds of proof was laid in the indictment" and the appeals court affirmed. *Id.* at 214 (quoting *United States v. Stirone*, 168 F. Supp. 490, 495 (W.D. Pa. 1957)).

The Supreme Court reversed, distinguishing between cases where the proof at trial narrowed the scope of the indictment and those where the evidence "broadened" it. *Id.* at 215–16 ("after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself"); *see also United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (finding no constructive amendment "[w]here charges are constructively narrowed"). The *Stirone* indictment had alleged interference with only one type of interstate commerce and "when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another." *Id.*

In the same manner, the Superseding Indictment in this case charged insider trading on a certain universe of stocks. App. 82–83. It was not a general indictment but instead specifically listed the "Target Companies" who were allegedly

victimized. *Id.* By broadening that universe to include hundreds of other stocks, the government constructively amended the Superseding Indictment. Though the elements of the crime remained the same, as they did in *Stirone*, the alleged means were substantially broadened beyond the scope of the grand jury's charge. This constitutes a constructive amendment and requires reversal.

>    2.    *Even if there was no constructive amendment, the variance prejudiced Mr. Korchevsky and therefore requires reversal.*

Even if this Court finds that the facts above do not constitute constructive amendment, this Court should still reverse and order a new trial because the variance substantially prejudiced Mr. Korchevsky both in his preparation for trial, *see Kaplan*, 490 F.3d at 129, and during the trial, *see McDermott*, 245 F.3d at 139.

First, the variance prejudiced Mr. Korchevsky's right to know the actual charges against him and prepare his defense—the very purpose of an indictment. *See Kaplan*, 490 F.3d at 129. As the trial court noted less than two weeks prior to trial, Mr. Korchevsky was entitled to know, at a minimum, what illegal trades he was accused of making. App. 177.14–177.17. The vacillating nature of the government's allegations about which stocks were involved, combined with the entirely different nature of the time frame and alleged means of the conspiracy testified about at trial, made it impossible for Mr. Korchevsky to adequately defend himself. The constitutional principles underlying our justice system do not require a defendant to guess about the nature of the charges against him.

Second, the variance prejudiced Mr. Korchevsky at trial. Unlike the specific allegations in the Superseding Indictment that contained the list of Targeted Companies and, by extension, a list of supposedly illegal trades, by the time of trial the government took the nebulous position that individual trades did not matter. App. 388. Thus, attempts to defend Mr. Korchevsky by showing how individual trades could not have been based on inside information were met with responses, from the government's main expert, that only the pattern mattered. *Id.* Indeed, many trades that formed part of the "pattern" were not even during the time frame when the newswires were hacked (according to the government's own witnesses). But that did not matter. The pattern was, to use the government's phrase, "suspicious," and the notion that the government might have to actually prove the illegality of individual trades fell by the wayside.

Unlike nearly all insider trading cases, the instant case did not involve the government showing precisely what stocks were traded, the materiality of the alleged inside information, and how much was made or lost on each stock. Instead, the government "grouped" the trades into two categories—those traded on PR Newswire and those traded on Marketwired, and required Mr. Korchevsky, like a fighter boxing a ghost, to defend against "suspicious" patterns of shifting trades.

Mr. Korchevsky was indicted on one thing and tried on another. He was accused by the grand jury of illegally trading in specific stocks with inside

information during specific periods of time. But at trial, he was convicted by the petit jury of a suspicious pattern of trading including a much larger universe of stocks over a different period of time. This variance created substantial prejudice and Mr. Korchevsky's conviction should be reversed.

## III. THE GOVERNMENT FAILED TO PROVE THE ELEMENTS OF SECURITIES FRAUD.

### A. Legal standards.

A defendant's attempt to show that an essential element of an offense was not proved at trial challenges the sufficiency of the evidence and is reviewed *de novo*. *United States v. Yannotti*, 541 F.3d 112, 120 (2d Cir. 2008). The Court views "the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008). The conviction will be upheld "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). But where, as here, the legal theory is flawed and the facts underlying the theory are not in dispute, this Court should reverse the conviction.

Counts Three and Four of the Superseding Indictment allege violations of securities laws (Rule 10b-5 of the Rules and Regulations of the SEC and violations

of Title 17, CFR Sec. 240.10b-5) for trading in stocks whose earnings were reported on PR Newswire (Count Three) and Marketwired (Count Four). App. 96–97. In essence, the government claims that an insider trading scheme defrauded "one or more potential investors" on the other side of securities transactions from Mr. Korchevsky. That theory—that Mr. Korchevsky had a duty to potential purchasers to disclose inside information he had allegedly obtained illegally— cannot form the basis for a securities fraud count under the circumstances of the present case.

As the Supreme Court has long recognized, there are two general types of insider trading cases: 1) the "classical theory," where a corporate insider trades in the securities of his or her corporation on the basis of material, nonpublic information; and 2) the misappropriation theory, where a fiduciary misappropriates material nonpublic information from his principal and uses that information in the marketplace. *United States v. O'Hagan*, 521 U.S. 642, 651–52 (1997). Both theories, at their genesis, require a breach of fiduciary duty.

A corporate insider (or his tipee) who trades on his own company's stock using inside information has employed "a 'deceptive device' under §10(b)" because "a relationship of trust and confidence" exists and that relationship "gives rise to a duty to disclose [or to abstain from trading] because of the 'necessity of

preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed . . . stockholders.'" *Id.* at 652. This is the "classical theory."

The misappropriation theory, on the other hand, applies when a fiduciary obtains confidential information from his employer (or principal) about another company and trades on that information, thereby "converting the principal's information for personal gain." *Id.* Such actions constitute a "fraud akin to embezzlement." *Id.* at 654. An example would be a lawyer who works at a law firm specializing in mergers who uses information obtained in that employment to trade on the stocks of the companies involved in the mergers.

As the Court explained in *O'Hagan:*

> The two theories are complementary. . . The classical theory targets a corporate insider's breach of duty to shareholders with whom the insider transacts; the misappropriation theory outlaws trading on the basis of nonpublic information by a corporate "outsider" in breach of a duty owed not to the trading party, but to the source of the information.

*Id.* at 652–53.

Both theories require fraud against some person or company at the source of the information—the victims. Violations of Section 10(b) and Rule 10b–5 "irreducibly entail[] some act that gives *the victim* a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008) (emphasis added). Absent this type of breach of fiduciary duty, a trader does not have a duty under the securities laws to others in the marketplace to refrain from trading on inside information.

This was the issue before the Court in *Chiarella v. U.S.*, 445 U.S. 222 (1980), when an employee of a printing company learned of a potential merger and traded based on that inside information. The trial court instructed the jury that the defendant's failure to disclose material and non-public information to sellers in connection with his purchase of stock could constitute a scheme to defraud those investors under the securities laws. *Id.* at 236. The circuit court affirmed the conviction, but the Supreme Court reversed:

> We see no basis for applying such a new and different theory of liability in this case. As we have emphasized before, the 1934 Act cannot be read "'more broadly than its language and the statutory scheme reasonably permit.'" Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud. When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak. We hold that a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic information.

*Id.* at 235. Nineteen years later, in *O'Hagan*, even while adopting the misappropriation theory for insider trading, the Court reaffirmed its earlier position that there was no general duty to potential investors to disclose inside information. *O'Hagan*, 521 U.S. at 655 ("the disclosure obligation runs to the source of the information . . . [not] to those with whom the misappropriator trades").

**B.    The victims identified in Counts Three and Four were not owed a duty by Mr. Korchevsky.**

In Counts Three and Four of the Superseding Indictment, the government claims that Mr. Korchevsky engaged in a scheme or artifice to defraud "investors or potential investors in the Target Companies." App. 96–97. But, as noted above, even looking at all facts in the light most favorable to the government, the alleged deception was not against those investors and potential investors. No evidence was offered to prove any act or omission giving those investors a false impression.

There is no allegation in the Superseding Indictment, nor was there evidence at trial, that Mr. Korchevsky, or the persons from whom he allegedly obtained inside information, breached a fiduciary duty. Instead, the government seeks to do here precisely what the Supreme Court has said it cannot do—impose a general duty on recipients of nonpublic information to either disclose that information to other buyers or sellers or refrain from trading. *See O'Hagan*, 521 U.S. at 655.

This Court should not read § 10(b) "more broadly than its language and the statutory scheme reasonably permit." *Chiarella*, 445 U.S. at 235. Without proof of "some act that gives [one or more investors or potential investors in the Target Companies] a false impression," Mr. Korchevsky's convictions under Counts Three and Four should be vacated and dismissed. *See Finnerty*, 533 F.3d at 148.

### C. Computer hacking does not provide the requisite deception under Section 10(b), particularly with regard to Count Four.

This Court has previously considered whether computer hacking could provide the requisite deception under Section 10(b) for insider trading schemes even if the acquisition of the inside information did not involve the breach of a fiduciary duty. *See Dorozhko*, 574 F.3d at 50.

In doing so, this Court considered the consequences of two types of computer "hacking." The first involved using false identification or masquerading as someone else in order to gain passwords and access. *Id.* at 50–51. The second was using a computer program to exploit a weakness in an electronic code. *Id.* With the former, this Court held that "misrepresenting one's identity in order to gain access to information that is otherwise off limits, and then stealing that information is plainly 'deceptive' within the ordinary meaning of the word." *Id.* at 51. But in the latter case, it is "unclear" whether exploiting a weakness in code to gain access is deceptive, as opposed to "mere theft." *Id.* Accordingly, this Court remanded the *Dorozhko* case for the district court to determine whether "the computer hacking in [that] case involved a fraudulent misrepresentation that was 'deceptive' within the ordinary meaning of Section 10(b)." *Id.* Asking the trial court to make that determination would have been wholly unnecessary if all computer hacking qualified as "deceptive" under Rule 10b-5.

Therefore, even if this Court were to ignore the plain language of the Superseding Indictment (which lists the victims as investors or potential investors in the Target Companies), and instead consider the victims to be the companies and the newswires, Count Four should still be vacated and dismissed.

The Superseding Indictment alleges that the hackers gained access to PR Newswire (Count Three) and Marketwired (Count Four) through exploitive computer programs, specifically "the use of malware. . . [using] unauthorized PHP commands" for PR Newswire and "a series of SQL injection attacks" for Marketwired. App at 87–88. But at trial, government witnesses testified that, with respect to PR Newswire only, there was also a series of "spear phishing" attacks that "tricked" staff members into clicking a link or running a program. App. 303.1. However, the computer hacking that formed the basis for Count Four did not involve fraud or deception against the employees of Marketwired.

Instead, according to FBI computer specialist Samad Shahrani, the Hackers used "penetration testing tools" such as SQL Map. App. 283. The SQL Map "figure[s] out how a database is laid out and inject[s] commands it [sic] to it; basically, make the database do things that the legitimate owner of the database wouldn't want you to be able to do." App. 284. It was, Shahrani testified, like somebody coming to your house and "trying the door and checking the windows," a process of searching for "vulnerabilities." App. 284–85.

These SQL programs are precisely what this Court described in *Dorozhko* as "exploiting a weakness in an electronic code to gain unauthorized access." *Dorozhko*, 574 F.3d at 51. They do not involve the type of fraudulent misrepresentation that is "deceptive" within the ordinary meaning of Section 10(b) or an "act that [gave] the victim a false impression." *Id.* at 50. Accordingly, Count Four should be vacated and dismissed, even if this Court decides that it can ignore the government's allegations that the investors and potential investors were the victims for Counts Three and Four and even if the Court further finds that computer hacking involving fraud can provide the requisite deceit for securities laws violations generally.[6]

## IV. THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY THAT A DISPUTED EMAIL HAD BEEN SENT TO OR BY MR. KORCHEVSKY, THEREBY DECIDING A CRITICAL AND CONTESTED FACTUAL ISSUE THAT SHOULD HAVE BEEN LEFT TO THE JURY.

### A. Legal standards.

A trial court's response to questions from the jury during its deliberations is reviewed under an abuse of discretion standard. *See, e.g.*, *United States v. Criollo*, 962 F.2d 241, 243 (2d Cir. 1992).

---

[6] If this Court finds Count Four legally flawed, all conspiracy counts should also be reversed and remanded. Where a legally inadequate theory is presented to the jury along with other legally supportable theories, any general verdict that might be premised on the legally inadequate theory should be remanded for a new trial. *Yates v. United States*, 354 U.S. 298, 312 (1957) overruled on other grounds by *Burks v. United States*, 437 U.S. 1 (1978). *United States v. Moye*, 454 F.3d 390, 400 n.10 (4th Cir. 2006); *United States v. Urciuoli*, 513 F.3d 290, 297 (1st Cir. 2008).

The Sixth Amendment guarantees a criminal defendant the right to a trial by jury. U.S. Const. amend. VI. Out of respect for this right, a trial judge is prohibited "from attempting to override or interfere with the jurors' independent judgment in a manner contrary to the interests of the accused." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 573 (1977).

When dealing with jury requests, this Court has said that the trial judge must "balance the jurors' need to review the evidence before reaching their verdict against the difficulty involved in locating the testimony to be read back, *the possibility of undue emphasis on a particular portion of testimony read out of context*, and the possibility of undue delay in the trial." *Id.* (emphasis supplied).

To guard against the dangers of undue prejudice, it is "advisable" that "appropriate cautions should be given to the jury," such as an "instruction reminding the jury to consider all the evidence without unduly emphasizing any portion of it." *United States v. Escotto*, 121 F.3d 81, 85 (2d Cir. 1997).

**B.** **The jury was presented with a fiercely disputed factual allegation as to whether Mr. Korchevsky ever accessed the stargate email account.**

Although the government could produce no evidence showing Mr. Korchevsky in possession of stolen press releases, it did attempt to highlight two indirect links to support its case. Both involve access to email accounts where the government claims stolen press releases were stored. One link involved a text

message allegedly sent to Mr. Korchevsky's phone in 2015 with a photo of the password to a "loscal" email account, though the government introduced no evidence or extraction report from Mr. Korchevsky's phone showing that he actually received it or accessed that account to obtain stolen press releases.

The second alleged link, and the only one that provided a connection to the pre-2015 trades (the vast majority of trades in the Superseding Indictment) was comprised of four alleged emails from a "stargate" account to a "stargate" account that were sent on July 30, 2012, using an iPad found in Mr. Korchevsky's home. App. 311–13. But on cross-examination, the FBI agent who introduced evidence of the email admitted that he did not know who had the iPad in question prior to August 11, 2015, the date of its seizure. App. 316. Nor did he know who purchased the iPad or who used it after it was purchased. *Id.*

> Q: You could see information about e-mailing and texting and Skyping from what you did, right?
>
> A: Yes.
>
> Q: But we don't know who was in possession when those things happened, correct?
>
> A: Correct.
>
> …
>
> Q: We don't know who sent or received the e-mails, right?
>
> A: Correct.

Q: We don't know who did any of the texting, right?

A: Correct.

App. 317.

The iPad was purchased on August 27, 2011, and registered by Sergey Levchenko, a technology specialist at APD Capital, LLC, one of Igor Dubovy's companies. App. 377–79. The purchaser named it "Mark's iPad." App. 317–18. Mark Dubovoy is Arkadiy Dubovoy's son. App. 318.

On December 19, 2012, more than two years after its purchase and five months after the exchange of stargate emails in July, the iPad was used for several Skype sessions that, based on Skype addresses, involved Igor Dubovoy, Roman Vishnevsky, Pavel Dubovoy (the address is actually dubovoyp) and a Russian name-- дубовой ттавел. App. 762. There are instant messages on the same date from Igor Dubovoy to others, but none to or from Mr. Korchevsky. App. 768–69. The first and only concrete indication from the extraction report that any Korchevsky used the iPad was a reference to SKorchevsky (presumably Svetlana Korchevsky), who is listed as an account user at some time after the stargate emails though there is no precise date for her entry. App. 770.

In its closing, the government argued that, notwithstanding evidence that the iPad was still being used by the Dubovoys months after the stargate emails, the iPad must have already been in Mr. Korchevsky's possession in July of 2012

because it  was used from a hotel in Switzerland during January of that year and Mr. Korchevsky was travelling through Geneva, Switzerland, at roughly the same time. App. 480–81. The government also argued that Mr. Korchevsky was in the Ukraine later in August 2012 when the iPad shows a wireless connection from a Ukraine telecom company. App. 481.

In response, defense counsel pointed out that Igor Dubovoy set up the user account for Skype on the iPad in December of 2012. App. 557. The Skype calls showing the iPad still in the possession of the Dubovoys months after the stargate emails did not involve Mr. Korchevsky. *Id.* And the companies whose names were pervasive on the iPad—Options House and APD Capital—were Igor's Dubovoy'scompanies. App. 559.

In short, the factual issues surrounding the stargate emails were fiercely contested throughout the trial and, given the relative importance of the emails, became an issue during jury deliberations as well.

### C.    The trial court improperly prejudiced the jury.

During its deliberations, the jury came back with the following request: "Any and all texts, phone calls, emails, bank records to and/or from Korchevsky on or in any devices found in his residence, or offices possession past or at the time of

the arrest."[7] App. 717, 820. Outside the presence of the jury, defense counsel argued that the stargate emails (from one stargate account to another stargate account), although found on a device seized from Mr. Korchevsky's home, did not fit the definition of emails "to and/or from Korchevsky" and that if the Court identified those emails to the jury in response to this request, it would "undermine our case and endorse the government's case." App at 716.

After the court requested clarification from the jury, they sent another note: "Exhibits 6001-6004" and "Korchevsky – Stargate – Dubovoy correspondence." App. 722–23, 821. Again, defense counsel argued that there was no such correspondence because the iPad was not in Mr. Korchevsky's possession at the time the emails were sent. App. 722–23. But instead of telling the jury to decide the case on the law and evidence already presented, or instructing them that the two sides disagreed as to whether any such correspondence existed and that it was for the jury had to make that factual determination, the Court decided to provide them with the extraction report from the iPad:[8]

> MR. BRILL: Our position, Your Honor, is that there—there is nothing that would respond to this request, which is a request for Korchevsky – Stargate – Dubovoy correspondence. There is no such Korchevsky – Stargate – Dubovoy correspondence.

---

[7] The trial Court's customary practice was not to send all exhibits with the jurors for their deliberations. App. 691–92.

[8] That extraction report was Government Exhibit 423, not one of the exhibits the jury had specifically requested.

THE COURT: Then what are we talking about; what is there?

MR. TUCKER: There's emails from Stargate to Stargate appearing on Mr. Korchevsky's iPad, Your Honor. This is –

THE COURT: Hold it. Give it to them.

MR. TUCKER: Okay. Thank you.

*Id.*

But the government did not stop there. Instead of merely sending the extraction report back to the jury, the government requested that the court put a "flag" on the page where the stargate emails were listed. App. 724. Defense counsel's objection was quickly overruled:

MR. BRILL: Well, Your Honor, we totally—we very much object to that—

THE COURT: I'm sure you do.

MR. BRILL: --that as being literally something that does not have Mr. Korchevsky's name on it, being flagged as correspondence.

THE COURT: I listened to the testimony, too. It goes back.

MR. GOPSTEIN: With the flag on the page, Your Honor, or—

THE COURT: Yes.

App. 724–25.

It is axiomatic that the trial court may not substitute its judgment on disputed factual issues for the judgment of the jury. *Martin Linen Supply Co.*, 430 U.S. at 573. By giving the jury Government Exhibit 423 in response to a request for

"Korchevsky – Stargate –Dubovoy correspondence," the Court rejected the defendant's factual contentions and sent an explicit message endorsing the government's position that the disputed July 30, 2012 e-mails were indeed correspondence involving Mr. Korchevsky. The flagging of the page where the emails were listed only exacerbated that message.

A similar scenario played out before the United States Court of Appeals for the First Circuit in the case of *United States v. Rivera-Santiago*, 107 F.3d 960, 962 (1st Cir. 1997), where the defendants were charged with drug trafficking. During deliberations, the jury asked the Court: "If there were any sign of flashing lights from the suspect aircraft and suspect vessel." *Id.* at 964. At the government's request, and over the defendant's objection, the trial judge decided to read back for the jury a portion of testimony from the only witness who had claimed to have seen "flashing lights." *Id.* The jury found the defendants guilty on all counts. *Id.* On appeal, the First Circuit found that the trial judge's decision to highlight one portion of testimony "invaded the province of the jury," *Id.* at 966, and that the "appropriate response to the jury's question would have been an instruction to the jury that it must take its own recollection of the evidence." *Id.* at 966 n.6.

In this case, the jury asked a similar question to the inquiry posed by the jury in *Rivera-Santiago*. Both questions sought information on contested factual issues. Both trial judges undertook to answer those questions by pointing to specific

evidence. Doing so, particularly without a limiting instruction, constitutes an abuse of discretion. *See Escotto*, 121 F.3d at 85.

## V. THE GOVERNMENT DID NOT ESTABLISH VENUE FOR COUNTS THREE AND FOUR.

### A. Legal standards.

Both the Sixth Amendment and Federal Rule of Criminal Procedure 18 require that a defendant be tried in the district where his crime was "committed." U.S. Const. amend. VI; Fed.R.Crim.P. 18. Because venue is not an element of the crime, the government bears the burden of proving venue at trial by only a preponderance of the evidence. *United States v. Smith*, 198 F.3d 377, 384 (2d Cir. 1999). A challenge to venue is a sufficiency challenge, and this Court therefore reviews the evidence in the light most favorable to the government, crediting inferences that can be drawn in the government's favor. *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011). Where the facts are not in dispute, as is the case here, this Court reviews the questions of law *de novo. Id.*

The Securities Fraud counts have a specific venue provision found in 15 U.S.C. §§ 78j(b) and 78ff: "Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. Under this provision, venue "is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." *Tzolov*, 642 F.3d at 319. The government must prove either (1) that the

defendant intentionally or knowingly caused an act constituting the offense in the district or (2) that it was reasonably foreseeable to the defendant that such an act would occur in the district and it did in fact occur. *Id.*; *see also United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003).

### B. None of the acts allegedly constituting a violation of the securities fraud statutes occurred in the Eastern District of New York.

In response to defendants' Rule 29 motion at trial, the government argued that venue was proper in the Eastern District of New York on the substantive securities counts for three reasons: first, it alleged that, given the fact that it had identified "hundreds" of trades "in the relevant accounts," it was reasonable to assume that for "a number of trades" the "counterparty was located in the Eastern District of New York"; second, that the Depository Trust & Clearing Corporation ("DTCC"), a clearinghouse computer for the exchanges, is housed in both Brooklyn and Manhattan; and third, that an NTS Capital account in which Mr. Korchevsky traded had its clearing agent in Brooklyn. App. 430–31. The government is wrong on all three counts.

First, the government did not identify "hundreds" of illegal trades. Throughout the case, the government claimed that it was the "pattern" of hundreds of "suspicious" trades, not the illegality of any one particular trade, that established Mr. Korchevsky's guilt. *See, e.g.*, App. 388. Accordingly, there is no universe of

"hundreds" of illegal trades proven at trial from which a jury could assume that a certain number of "counterparties" must have been in Brooklyn.

Second, the fact that one of the DTCC computers is located in Brooklyn does not establish venue there. The government did not argue that Mr. Korchevsky knowingly caused a violation of the securities act to occur in Brooklyn but that, "it was reasonably foreseeable, especially to two sophisticated traders who passed FINRA exams, that the data would make its way from the exchanges through the DTCC." App. 431. But the government presented no evidence in support of its contention that someone in Mr. Korchevsky's position would know that.

The stocks in question were traded on the NASDAQ exchange and the New York Stock exchange, both located in Manhattan. A DTCC employee explained the process:

> [t]he DTCC is the back office of Wall Street . . . when a trade happens on different venues, you have buyers and sellers which are brokers that come in and submit orders to an exchange. The exchange then processes those orders, matches those orders at a certain price and then sends those compared trades down to DTCC for processing.

App. 395.

Another employee of the DTCC said that there were two "data centers," one in Manhattan and one in Brooklyn. App. 399. Following Hurricane Sandy from October to mid-December of 2012, only the Brooklyn server was in use, *id.*, but, as

noted earlier, *see supra* pp. 14–15, this was during a time when there was no access to inside information.

In any event, the trades have already been processed on the exchanges (located in Manhattan) by the time they are sent to the "back office" servers. App. 395. As the government witness admitted, the individuals who buy and sell stocks have no involvement at this stage of the transaction. App. 396.

Thus, the administrative "back office" of Wall Street is certainly not where an act constituting the offense of securities fraud occurred. *See Tzolov*, 642 F.3d at 319. Even if it were, there is no evidence that Mr. Korchevsky should have known the intricacies of this process.

The government's third basis for venue fares no better. The government called Brian Lafaman as a witness, an Executive Director at JP Morgan in its Brooklyn office. App. 401. He testified that Mr. Korchevsky's NTS Capital Fund had an account at JP Morgan and that Mr. and Mrs. Korchevsky wired money from their E-Trade account in Pennsylvania into this account in Brooklyn. App. 403–04. Even viewing this evidence in the light most favorable to the government, these were mere preparatory acts to setup an account and cannot form the basis for venue under 15 U.S.C. §§ 78j(b) and 78ff. *See Tzolov*, 642 F.3d at 319. Later, funds were also wired out of this account. App. 404. While this may constitute venue for the conspiracy counts it does not constitute a trade on insider information which is at

the core of counts three and four. Accordingly, the substantive securities fraud counts must fail for lack of venue.

## CONCLUSION

For the reasons stated above, this Court should vacate and dismiss Mr. Korchevsky's conspiracy convictions because the government failed to prove the facts and legal theories alleged in the Superseding Indictment thereby creating a constructive amendment or a variance that substantially prejudiced Mr. Korchevsky. The securities fraud convictions should be also be reversed and dismissed because the government failed to prove the elements of the offenses charged and failed to prove proper venue. In the alternative, this Court should vacate and remand on all counts because the trial judge improperly invaded the province of the jury, thereby violating Mr. Korchevsky's Sixth Amendment rights.

In sum, all counts should be vacated and dismissed, or, in the alternative, the case should be remanded for a new trial with Counts Three and Four to be tried in an appropriate venue.

Dated: July 8, 2019                    Respectfully submitted,

                                       /s/ Randy D. Singer, Esq.
                                       SINGER DAVIS, LLC
                                       1209 Laskin Road
                                       Virginia Beach, VA 23451
                                       (757) 301-9995
                                       randy.singer@singerdavis.law
                                       *Attorney for Appellant Vitaly Korchevsky*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      The undersigned counsel certifies that this document complies with the word limit of Fed. R. App. P. 32(a) and Second Circuit Local Rule 32(a)(4)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,873 words. In preparing this certificate, I relied on the word count program within Microsoft Word.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Fourteen Point Times New Roman Font.

Dated: July 8, 2019

Respectfully submitted,

/s/ Randy D. Singer, Esq.
SINGER DAVIS, LLC
1209 Laskin Road
Virginia Beach, VA 23451
(757) 301-9995
randy.singer@singerdavis.law
*Attorney for Appellant Vitaly Korchevsky*

SPECIAL  APPENDIX

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

                                                              **Page**

Final Judgment, filed March 21, 2019 ....................... SPA-1

  Annexed to Judgment -
  Final Order of Forfeiture, dated March 21, 2019 .. SPA-11

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| VITALY KORCHEVSKY | Case Number:  CR 15-381(S-1)-01(RJD) |
| | USM Number:  72318-066 |
| | STEVEN G.  BRILL, ESQ. |
| | Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)    one(1), two(2), three(3) four(4) & five(5) of a five count superseding indictment (S-1).
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 1343 & 1349 | Conspiracy to commit wire fraud. | 8/31/2015 | 1(S-1) |
| 18 U.S.C. 371 | Conspiracy to commit securities fraud & computer intrusions. | 8/31/2015 | 2(S-1) |

The defendant is sentenced as provided in pages 2 through    10    of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)    underlying indictment        ☑ is    ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

3/21/2019
Date of Imposition of Judgment

Signature of Judge

RAYMOND J. DEARIE      U.S.D.J.
Name and Title of Judge

3/21/2019
Date

SPA-2

AO 245B (Rev. 02/18)    Judgment in a Criminal Case
Sheet 1A

| | | Judgment—Page | 2 | of | 10 |

DEFENDANT:  VITALY KORCHEVSKY
CASE NUMBER:  CR 15-381(S-1)-01(RJD)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 15 U.S.C. 78j(b),<br>15 U.S.C. 78ff | Securities fraud-PR newswire hack. | 8/31/2015 | 3(S-1) |
| 15 U.S.C. 78j(b),<br>15 U.S.C. 78ff | Securities fraud-market-wired hack. | 8/31/2015 | 4(S-1) |
| 18 U.S.C. 1956(h) | Money laundering conspiracy. | 8/31/2015 | 5(S-1) |

AO 245B (Rev. 02/18)   Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page   3   of   10

DEFENDANT:  VITALY KORCHEVSKY
CASE NUMBER:  CR 15-381(S-1)-01(RJD)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total
term of:

SIXTY(60) MONTHS ON EACH COUNT TO RUN CONCURRENTLY WITH EACH OTHER.

☑ The court makes the following recommendations to the Bureau of Prisons:

If consistent with the Bureau of Prisons policies, practices and guidelines, the Court recommends designation to a minimum
security institution and further invites consideration of Otisvill, McKean or Schukill.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at   _____   ☐ a.m.   ☐ p.m.   on   _____ .

   ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☑ before 2 p.m. on   7/29/2019   .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on   _____   to   _____

at   _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By   _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
                       Sheet 3 — Supervised Release

Judgment—Page __4__ of __10__

DEFENDANT:  VITALY KORCHEVSKY
CASE NUMBER:  CR 15-381(S-1)-01(RJD)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

  THREE(3) YEARS ON EACH COUNT TO RUN CONCURRENTLY.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | Judgment—Page | 5 | of | 10 |

DEFENDANT: VITALY KORCHEVSKY
CASE NUMBER: CR 15-381(S-1)-01(RJD)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____


AO 245B(Rev. 02/18)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page ___6___ of ___10___

DEFENDANT: VITALY KORCHEVSKY
CASE NUMBER: CR 15-381(S-1)-01(RJD)

## SPECIAL CONDITIONS OF SUPERVISION

1)Upon request, the defendant shall provide the U.S. Probation Department with full disclosure of his financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, the defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the Probation Officer in the investigation of his financial dealings and shall provide truthful monthly statements of his income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to his financial information and records;

2)Defendant shall comply with the Restitution Order.

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

| | | | | Judgment — Page | 7 | of | 10 |

DEFENDANT: VITALY KORCHEVSKY
CASE NUMBER: CR 15-381(S-1)-01(RJD)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **JVTA Assessment*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | $ 500.00 | $ | $ 250,000.00 | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 02/18)  Judgment in a Criminal Case
Sheet 5A — Criminal Monetary Penalties

Judgment—Page __8__ of __10__

DEFENDANT:  VITALY KORCHEVSKY
CASE NUMBER:  CR 15-381(S-1)-01(RJD)

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

FINE:  $250,000.00 PAYABLE WITHIN 90 DAYS.

ORDER OF RESTITUTION IS DEFERRED AND WILL BE ENTERED SHORTLY.



AO 245B  (Rev. 02/18)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page __9__ of __10__

DEFENDANT:  VITALY KORCHEVSKY
CASE NUMBER:  CR 15-381(S-1)-01(RJD)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __500.00__  due immediately, balance due

☐  not later than _____ , or
☐  in accordance with  ☐  C,  ☐  D,  ☐  E, or  ☐  F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

FINE OF $250,000.00 PAYABLE WITHIN 90 DAYS.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

Defendant and Co-Defendant Names and Case Numbers *(including defendant number),* Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 6B — Schedule of Payments

Judgment—Page   10   of   10

DEFENDANT: VITALY KORCHEVSKY
CASE NUMBER:  CR 15-381(S-1)-01(RJD)

## ADDITIONAL FORFEITED PROPERTY

FINAL ORDER OF FORFEITURE DATED 3/21/2019 ATTACHED TO JUDGMENT AND COMMITMENT ORDER.

SPA-11

Courtesy Copy
Original Filed Electronically

SLR:BDM:TRP
F. #2010R00103

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

    - against -

LEONID MOMOTOK,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

VITALY KORCHEVSKY,

      Third Party Petitioner.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

SVETLANA KORCHEVSKY,

      Third Party Petitioner.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

FINAL ORDER OF FORFEITURE

15-CR-381(S-1) (RJD)

WHEREAS, on or about August 2, 2016, the defendant LEONID MOMOTOK ("Momotok"), entered a plea of guilty to the offense charged in Count One of the above-captioned Indictment, charging a violation of 18 U.S.C. § 1349;

WHEREAS, on or about October 3, 2016, this Court entered a Preliminary Order of Forfeiture ("Preliminary Order") pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure against Leonid Momotok providing for the entry of a forfeiture money judgment in the amount of thirty million eight hundred thousand dollars and zero cents ($30,800,000.00) (the "Momotok Forfeiture Money Judgment"), and finding all right, title and interest in the following:

SPA-12

(a)   $4,651,166.04 in United States currency, more or less, on deposit in Pershing LLC account number XXXXXX191 held in the name of NTS Capital Fund, LLP, and all proceeds traceable thereto (the "Pershing Currency");

(b)   $1,074,616.44 in United States currency, more or less, seized on or about August 11, 2015 from E*trade account number xxxxxx623 held in the name of Vitaly Korchevsky and Svetlana Korchevsky, and all proceeds traceable thereto (the "E*Trade Currency");

(c)   $34,322.65 in United States currency, more or less, seized on or about August 11, 2015 from PNC Bank account number xxxxxx988 held in the name of Vitaly Korchevsky and Svetlana Korchevsky, and all proceeds traceable thereto (the "PNC Bank Currency");

(d)   the real property and premises located at 1591 Meadow Lane, Glen Mills, Pennsylvania 19342;

(e)   the real property and premises located at 3 Skyline Drive, Glen Mills, Pennsylvania 19342;

(f)   the real property and premises located at 7 Skyline Drive, Glen Mills, Pennsylvania 19342;

(g)   the real property and premises located at 9 Blackhorse Lane, Media, Pennsylvania 19063;

(h)   the real property and premises located at 316 Willowbrook Road, Upper Chichester, Pennsylvania 19061;

SPA-13

(i)  the real property and premises located at 674 Cheyney Road, Cheyney, Pennsylvania 19319;

(j)  the real property and premises located at 1290 Samuel Road, West Chester, Pennsylvania 19380;

(k)  the real property and premises located at 1737 Graham Road, Macon, Georgia 31211;

(l)  the real property and premises located at 122-134 Lancaster Avenue, Malvern, Pennsylvania 19355;

(m)  the real property and premises located at1801 Kings Highway, Coatesville, Pennsylvania 19320; and

(n)  the real property and premises located at1709 Slitting Mill Road, Glen Mills, Pennsylvania 19342;

(items (d) through (n), collectively, hereinafter, the "Subject Real Property") (items (a) through (n), collectively, hereinafter, the "Subject Assets"), forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), as any property, real or personal, constituting or derived from proceeds traceable to a violation of 18 U.S.C. § 1349, and/or as substitute assets, pursuant to 21 U.S.C. § 853(p);

WHEREAS, the United States and Leonid Momotok move this Court to amend the Momotok Forfeiture Money Judgment amount to one million three hundred sixteen thousand three hundred and sixty-three dollars and sixty-seven cents ($1,316,363.67) (the "Amended Momotok Forfeiture Money Judgment");

WHEREAS, on or about February 17, 2017, Vitaly Korchevsky through counsel, Sullivan & Brill, LLP, filed a petition (hereinafter, the "V.K. Petition") asserting an interest in certain of the Subject Assets (the "V.K. Petition Assets") (Dkt. No. 144):

WHEREAS, on or about on May 19, 2017, Svetlana Korchevsky, through counsel Pepper Hamilton, LLP, filed a petition (hereinafter, the "S.K. Petition") asserting an interest in certain of the Subject Assets ("the S.K. Petition Assets") (Dkt. No. 166):

WHEREAS, legal notice of the forfeiture was published in this district on the official government website, www.forfeiture.gov, for thirty (30) consecutive days beginning September 22, 2018, through and including October 21, 2018 (Dkt. No. 379);

WHEREAS, other than Vitaly Korchevsky and Svetlana Korchevsky, no third party has filed with the Court any petition or claim in connection with the Subject Assets and the time to do so under 21 U.S.C. § 853(n)(2) has expired;

WHEREAS, on or about March 19, 2019, the United States and Vitaly Korchevsky and Svetlana Korchevsky, by and through their attorneys, executed a Stipulation of Settlement ("Stipulation") which provided for the resolution of the forfeiture of the Subject Assets and settlement of the V.K. Petition and the S.K. Petition without further litigation;

WHEREAS, pursuant to the Stipulation, and 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) and 28 U.S.C. § 2461(c), Vitaly Korchevsky and Svetlana Korchevsky consented to the forfeiture of all right, title and interest in $4,227,068, and all proceeds traceable thereto, seized on or about August 11, 2015 from Pershing LLC account number XXXX91, held in the name of NTS Capital Fund, LLP, (hereinafter, the "Pershing NTS Capital Account") having an agreed upon present value of fourteen million four hundred fifty-two

dollars and zero cents ($14,452,245.00) (hereinafter, the "Forfeitable Currency"), as: (a) any property, real or personal, which constitutes or is derived from proceeds traceable to violations of 15 U.S.C. §§ 78j(b) and 78ff, and 18 U.S.C. § 1349; (b) any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property; and/or (c) substitute assets, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1);

WHEREAS, pursuant to the Stipulation, the United States consented to the release of the sum of five hundred fifty-one thousand nine hundred and eight dollars and zero cents ($551,908.00) from the Pershing NTS Capital Account to Svetlana Korchevsky (the "S.K. Settlement Payment") in full and complete settlement of the S.K. Petition as well as any and all claims that Svetlana Korchevsky may have to the Subject Assets, the S.K. Petition Assets and all claims giving rise to the seizure and forfeiture of the Subject Assets;

WHEREAS, pursuant to the Stipulation, the United States consented to the release of two hundred and fifty thousand dollars and zero cents ($250,000.000) from the Pershing NTS Capital Account to Randy Singer, Esq. appellate counsel for Vitaly Korchevsky, for attorney's fees (hereinafter, the "Attorney's Fee Payment");

WHEREAS, pursuant to the Stipulation, the United States, Vitaly Korchevsky and Svetlana Korchevsky agreed that any restitution amount ordered by the Court against Vitaly Korchvesky in connection with his sentence in the above-captioned case shall be paid from the E*Trade Currency and remitted directly to the Clerk of Court (the "Restitution Payment"); and

WHEREAS, pursuant to the Stipulation, the United States, Vitaly Korchevsky and Svetlana Korchevsky agreed that any fine imposed by the Court against Vitaly

Korchevsky in connection with his sentence in the above-captioned case shall be paid from the E*Trade Currency and remitted directly to the Clerk of Court (the "Restitution Payment").

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.      The Momotok Forfeiture Money Judgment entered on October 3, 2016 is hereby vacated.

2.      Leonid Momotok shall forfeit to the United States the full amount of the Momotok Amended Forfeiture Money Judgment pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c).

3.      All payments made by Momotok toward the Momotok Amended Forfeiture Money Judgment shall be made by a money order, or a certified or official bank check, payable to the "United States Marshals Service" with the criminal docket number noted on the face of the check.  The defendant shall cause said check to be delivered by overnight mail to Assistant United States Attorney Tanisha R. Payne, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201.  The Momotok Amended Forfeiture Money Judgment shall be paid in full on or before the date of Momotok's sentencing.

4.      If the Momotok Amended Forfeiture Money Judgment is not received as provided above, Momotok shall forfeit any other property of his up to the value of the outstanding balance, pursuant to 21 U.S.C. § 853(p).  Momotok shall fully assist the government in effectuating the payment of the Momotok Amended Forfeiture Money Judgment.  Momotok shall not file or interpose any claim or assist others to file or interpose

any claim to any of the property against which the government seeks to execute the Momotok Amended Forfeiture Money Judgment in any administrative or judicial proceeding.

5.    IT IS FURTHER ORDERED that pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), all right, title, and interest in the Forfeitable Currency is hereby condemned, forfeited, and vested in the United States of America.

6.    IT IS FURTHER ORDERED that Pershing LLP shall liquidate funds and securities in the Pershing NTS Capital Account as necessary in order to remit a check payable to the "United States Marshals Service" in the amount of the Forfeitable Currency, to wit, $14,452,245.00.

7.    IT IS FURTHER ORDERED that the United States Marshals Service, or its duly authorized agents and/or contractors be, and hereby are, directed to dispose of the Forfeitable Currency in accordance with all applicable laws and regulations.

8.    IT IS FURTHER ORDERED that Pershing LLP shall liquidate funds and securities in the Pershing NTS Capital Account as necessary in order to remit a check in the amount of the S.K. Settlement Payment, to wit, $551,908.00, payable to "Svetlana Korchevsky," to be delivered to Steven Brill, Esq., counsel for Svetlana Korchevsky.

9.    IT IS FURTHER ORDERED that Pershing LLP shall liquidate funds and securities in the Pershing NTS Capital Account as necessary in order to remit a check in the amount of the Attorney's Fee Payment, to wit, $250,000.00, payable to "Randy Singer, Esq.," to be delivered to Randy Singer, Esq., appellate counsel for Vitaly Korchevsky.

10.     IT IS FURTHER ORDERED that the United States Marshals Service shall deduct the Restitution Payment from the previously seized E*Trade Currency and remit the amount of the Restitution Payment to the Clerk of Court as payment toward the restitution judgment, if any, entered against Vitaly Korchevsky in connection with his sentence in the above-captioned case.

11.     IT IS FURTHER ORDERED that Pershing LLP shall liquidate funds and securities in the Pershing NTS Capital Account as necessary in order to remit a check payable to the "United States Marshals Service" in the amount of the Fine Payment.

12.     IT IS FURTHER ORDERED that in the event that, after remittance of the Forfeitable Currency and the Attorney Fee Payment, the funds in the Pershing NTS Capital Account are insufficient to cover the total amount of the Fine Payment, the United States Marshals Service shall deduct the outstanding balance of the Fine Payment from the previously seized E*Trade Currency and/or PNC Currency, and remit the Fine Payment to the Clerk of Court as payment toward the fine imposed, if any, against Vitaly Korchevsky in connection with his sentence in the above-captioned case.

13.     IT IS FURTHER ORDERED that after the amounts of the Forfeitable Currency, the S.K. Settlement Payment and the Fine Payment are deducted from the Pershing NTS Capital Account, Pershing LLC is ordered to release the previously ordered restraint on the Pershing NTS Capital Account and release the remaining balance in the account to Vitaly Korchevsky (the "Remaining Pershing Currency").

14.     IT IS FURTHER ORDERED that after the Restitution Payment and the Fine Payment, if applicable, are deducted from the previously seized E*Trade Currency, the United States Marshals Service is directed to remit the balance of the E*Trade Currency, if

any, (the "Remaining E*Trade Currency") to Vitaly Korchevsky in the form of an electronic transfer executed pursuant to a duly executed United States Marshals Service ACH electronic transfer form.

15.    IT IS FURTHER ORDERED that after the Fine Payment, if applicable, is deducted from the previously seized PNC Bank Currency, the United States Marshals Service is directed to remit the balance of the PNC Bank Currency (the "Remaining PNC Currency"), if any, to Vitaly Korchevsky in the form of an electronic transfer executed pursuant to a duly executed United States Marshals Service ACH electronic transfer form.

16.    IT IS FURTHER ORDERED that the V.K. Petition and the S.K. Petition are hereby withdrawn.

17.    IT IS FURTHER ORDERED that the ancillary criminal forfeiture hearing in the above-captioned case is hereby terminated and the Clerk of Court is directed to mark the criminal forfeiture ancillary proceeding in this matter closed.

18.    In the event of an appeal filed by Vitaly Korchevsky in connection with United States v. Vitaly Korchevsky, 15-CR-381 (S-1)(RJD), the United States shall place a hold on and not disburse the Forfeitable Currency, the Restitution Payment, the Fine Payment, the Remaining Pershing Currency, the Remaining E*Trade Currency, and the Remaining PNC Bank Currency, pending resolution of the appeal.  In the event of an adjudication by a final appellate court reversing or vacating Vitaly Korchevsky's conviction in United States v. Korchevsky, 15-CR-381 (S-1)(RJD), the portions of this Final Order providing for the forfeiture of the Forfeitable Currency, and the disbursement of the Restitution Payment, the Fine Payment, the Remaining Pershing Currency, the Remaining E*Trade Currency, and the Remaining PNC Currency shall be vacated and the status quo

ante restored, such that the United States and Vitaly Korchevsky preserve their rights and arguments with respect to the forfeiture of the Forfeitable Currency.

19.     IT IS FURTHER ORDERED that the United States District Court for the Eastern District of New York shall retain jurisdiction over this case for the purposes of enforcing the Preliminary Order and this Final Order of Forfeiture and any supplemental orders of forfeiture as may be necessary.

20.     IT IS FURTHER ORDERED that the Clerk of Court shall enter final judgment of forfeiture to the United States in accordance with the terms of this Final Order of Forfeiture and the Preliminary Order.

21.     Upon entry of this Order of Forfeiture ("Order"), the United States Attorney General or his designee is authorized to conduct any proper discovery in accordance with Fed. R. Crim. P. 32.2(b)(3) and (c).  The United States alone shall hold title to the monies paid by Momotok to satisfy the Momotok Amended Forfeiture Money Judgment following the Court's entry of the judgment of conviction.

22.     The entry and payment of the Momotok Amended Forfeiture Money Judgment, the forfeiture of the Forfeitable Currency, Attorney Fee Payment and the Restitution Payment are not be considered a payment of a fine, penalty, restitution loss amount, or income taxes that may be due, and shall survive bankruptcy.

23.     Pursuant to Fed. R. Crim. P. 32.2(c)(2), this Order of Forfeiture shall become final upon the Court's "so ordering" of this Order.  The Clerk of Court shall enter a final judgment of forfeiture to the United States in accordance with the terms of this Order, and the Preliminary Order of Forfeiture.

24. This Order shall be binding upon Leonid Momotok, Vitaly Korchevsky and his successors, administrators, heirs, assigns and transferees, and shall survive the bankruptcy of any of them.

25. This Order shall be final and binding only upon the Court's "so ordering" of the Order.

26. The Court shall retain jurisdiction over this action to enforce compliance with the terms of this Order, and to amend it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

27. The Clerk of the Court is directed to send, by interoffice mail, five (5) certified copies of this executed Order to the United States Attorney's Office, Eastern District of New York, Attn: FSA Senior Law Clerk William K. Helwagen, 271-A Cadman Plaza East, 7th Floor, Brooklyn, New York 11201.

Dated:   Brooklyn, New York
         March 21            , 2019

                              SO ORDERED:

                              s/ Raymond J Dearie
                              HONORABLE RAYMOND J. DEARIE
                              UNITED STATES DISTRICT JUDGE
                              EASTERN DISTRICT OF NEW YORK